IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| TAMAR DEVELL HARVEY, | ) | |
|     Plaintiff, | ) | Civil Action No. 7:16cv00097 |
| | ) | |
| v. | ) | |
| | ) | |
| DALE MORENO, M.D., *et al.*, | ) | By: Elizabeth K. Dillon |
|     Defendants. | ) | United States District Judge |

**MEMORANDUM OPINION**

Plaintiff Tamar Devell Harvey, a Virginia inmate proceeding *pro se*, brings this civil rights action pursuant to 42 U.S.C. § 1983. Harvey names current and former supervisory staff of the Augusta Correctional Center ("ACC") and Virginia Department of Corrections ("VDOC") as defendants for the allegedly deficient medical treatment he received in violation of the Eighth Amendment of the United States Constitution. The parties filed motions for summary judgment, and this matter is ripe for disposition. After reviewing the record, the court grants defendants' motions for summary judgment and denies Harvey's motions for summary judgment.

I. BACKGROUND

**A. Plaintiff's Allegations and Medical Record Summary**

Harvey's three claims against the defendants involve treatments for stage 1 HIV, hypertension, and stage 3 syphilis after Harvey arrived at ACC on February 18, 2015. Harvey alleges that defendants Dr. Moreno and Health Services Administrator ("HSA") Landrum failed multiples times to timely prescribe, supply, and/or administer three medications: Atripla, which is used to treat HIV, and chlorthalidone and lisinopril, which are used to treat hypertension. Harvey also faults Dr. Moreno and HSA Landrum for not ordering an ultrasound exam to learn if syphilis caused organ damage after a facility doctor had already ordered an ultrasound exam to

check for breast cancer.[1]  Harvey further alleges that HSA Landrum told him to stop filing grievances "in an effort to try to cover up her many wrongful actions."[2]  Harvey joined ACC Warden Woodson and the VDOC Health Services Director Herrick as defendants, arguing that they were made aware of the alleged constitutional violations via administrative grievances and appeals and failed to intervene.  Harvey seeks $100,000,000 as compensation for allegedly suffering severe pain, very severe psychological injuries, mental anguish, and emotional distress.[3]

The parties filed Harvey's medical records from the Virginia Commonwealth University Medical Center ("MCV"), the Richmond City Jail ("Jail"), Powhatan Reception and Classification Center ("PRCC"), and ACC.  The records from MCV, the Jail, and PRCC predate Harvey's transfer to ACC.

In an Infectious Disease Outpatient Report from MCV in March 2013, it was noted that Harvey had been diagnosed with HIV in 2008 and had been prescribed a daily pill of Atripla, chlorthalidone, and lisinopril.  As of March 29, 2013, Harvey's blood pressure measured 118/80, ostensibly while taking chlorthalidone and lisinopril.  A different, undated report from MCV notes Harvey started highly active antiretroviral therapy to treat HIV in 2010, that therapy was interrupted between January and April 2011, and Harvey had been "stable" on Atripla since 2011.  The undated report also notes that his blood pressure was "high" despite being off chlorthalidone and lisinopril for two months.

By December 2013, Harvey had been arrested and incarcerated at the Richmond City Jail ("Jail").  The Jail's medical record shows that Jail staff diagnosed chronic hypertension without

---

[1] The exam was negative for cancer.  Notably, a facility doctor had ordered the ultrasound exam to investigate Plaintiff's specific complaints of a lump and pain in his left chest.

[2] Harvey's own attachment about the prison's grievance procedures notes that the Warden, not the HSA or the Medical Director, responds to a regular grievance.

[3] Harvey's request for a writ of habeas corpus is not appropriate relief for this case.  *See, e.g.*, 18 U.S.C. § 3626(a); *Heck v. Humphrey*, 512 U.S. 477, 486-88 (1994).

chest pain, "SOB," palpitations, or ankle-edema as of December 27, 2013. The Jail's record also shows that Harvey's HIV viral load was undetectable with a CD4 count of "900?" [sic] in September 2013.[4] The Jail's records do not note prescriptions for chlorthalidone or lisinopril.

Harvey's blood pressure at PRCC in January 2015 measured 126/86 and 132/89. The PRCC medical records neither contain copies of the Jail's records nor reference chlorthalidone, lisinopril, or hypertension. Harvey was transferred from PRCC and arrived at ACC on February 18, 2015.

1. HIV

Harvey allegedly did not receive a daily dose of Atripla at ACC on February 18-23, March 27-29, November 19, and December 17, 2015, and January 14, 2016.[5] Harvey believes medical staff dispensed his Atripla pills to other inmates, causing his monthly supply to be consumed before the end of the month. Nonetheless, Harvey notes that his Atripla prescription was through the "self-meds" program, otherwise referred to as "keep on person." Per the prison memo Harvey filed in this case, the self-meds program requires inmates to retrieve, store,

---

[4] *See Bragdon v. Abbott*, 524 U.S. 624, 636-37 (1998) ("A person is regarded as having AIDS when his or her CD4+ count drops below 200 cells/mm3 of blood or when CD4+ cells comprise less than 14% of his or her total lymphocytes. During this stage, the clinical conditions most often associated with HIV, such as pneumocystis carninii pneumonia, Kaposi's sarcoma, and non-Hodgkins lymphoma, tend to appear. In addition, the general systemic disorders present during all stages of the disease, such as fever, weight loss, fatigue, lesions, nausea, and diarrhea, tend to worsen. In most cases, once the patient's CD4+ count drops below 10 cells/mm3, death soon follows." (internal citations and omitted)); *Grace v. Hakala*, No. 1:11cv81, 2016 U.S. Dist. LEXIS 24228, at *4, 2014 WL 790786, at *1 (E.D. Mo. Feb. 26, 2014) (Blanton, M.J.) ("An undetectable viral load is the goal of antiviral therapy. Notwithstanding improvements in available therapeutic regimens available for treatment of HIV/AIDS, there is no cure for HIV infection.").

[5] The court refers to the dates Harvey alleged in various filings attached to the complaint because he did not allege specific dates in the complaint. ECF No. 2, pageid# 26-27; No. 19-1, pageid# 94; *see Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (recognizing a court must liberally construe a *pro se* complaint and also consider documents that are explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits); *see also* ECF No. 25-1, pageid# 270, 312; No. 25-3, pageid# 317, 321, 331; No. 38-1, pageid# 451; *but see Cloaninger v. McDevitt*, 555 F.3d 324, 336 (4th Cir. 2009) (noting that a plaintiff may not amend a complaint through argument in a brief about summary judgment).
    The court recognizes that sometimes Harvey alleges alternatively that he did not receive Atripla between February 20 and 23, 2015, versus between February 18 and 23, 2015. *Compare, e.g.*, ECF No. 2, pageid# 26-27, *with* No. 25-1, pageid# 270.

consume, and refill their prescriptions as needed by accessing the "self-med window" and "self-med box" during specific days and times.

Harvey filed an emergency grievance in the morning of March 30, 2015, complaining that he had not recently received his doses of Atripla. HSA Landrum responded that same morning, noting, "Dr. MacDonald is working with MCV as they have denied your refill until your telmed."

Harvey had an infectious disease outpatient visit with MCV on April 16, 2015. The report from that visit notes, "HIV VL 155 copies – in 2013, undetectable," and, "HIV+, stage 1. Reengaging in care. High CD4 with detectable VL, but too low for genotype. Pt was off meds for approx 8 days when labs were done." Harvey's follow-up lab work on May 11, 2015, revealed improvement, noting "HIV+, stage 1 . . . on effective regimen. High CD4 undetectable VL," and "CD4 Absolute" as "972 /mm3."

Harvey filed an informal complaint on November 23, 2015, complaining that ACC medical staff failed to give him his Atripla on February 20-23, March 27-29, and November 19, 2015. HSA Landrum responded on December 2, 2015, claiming, "Your meds are KOP ["Keep On Person"] and your meds have not been turned back in so that you can be issued your next supply. If you did not have them KOP you should have reported to pill line."

Harvey filed an informal complaint on December 28, 2015, complaining that ACC medical staff failed to give him his Atripla on February 20-23, March 27-29, November 19, and December 17, 2015. Harvey also alleged that HSA Landrum had explained to him on December 17, 2015, that the prison's order of Atripla had not yet arrived from Pennsylvania. HSA Landrum responded on December 29, 2015, explaining, "Your meds are self meds. You should have had a dose for 12/17/15 before turning your meds in to be refilled and issued. You received

4

your meds on 12/18/15 and should have taken your dose. No doses should have been missed if meds taken properly."

In his regular grievance dated December 13, 2015, Harvey explained that he always turns his medication in on Wednesdays and that he is frequently turned away from the pill line because his Atripla is not kept in stock. Harvey also reiterated that medical staff had not given him his doses of Atripla on February 20-23, March 27-29, and November 19, 2015. Warden Woodson deemed the grievance unfounded on January 11, 2016, explaining, "[I]f your meds are KOP and you have not turned them in you will not be issued your next supply. If you do not KOP then you need to report to pill line."

Harvey appealed the regular grievance, alleging that HSA Landrum is a "bold faced liar." Harvey said he had turned in his medication on November 18, 2015, had gone to the pill line the next morning, and was told his Atripla was not in stock. The Health Services Director deemed the appeal unfounded, explaining, "According to your November 2015 Medication Record, it is documented that you received a refill of your Atripla medication on November 19, 2015."

After an unsuccessful informal complaint, Harvey filed a regular grievance on February 1, 2016, explaining how he believed medical staff gave his Atripla pills to other inmates because his pill bottles did not have an intact safety seal. Warden Woodson deemed the grievance unfounded, explaining:

> According to Ms. Shipp, RN they do not give medications that are for one offender to another. You should always check before leaving the nurses sight and if you find a safety seal broken you need to return it immediately. There are some bottles of medication that are filled from the pharmacy that don't have safety seals.

Harvey appealed to the Health Services Director, writing:

> Nowhere contained within the [ACC]'s selfs-meds contract does it state for me, or any offender to open their bottles of medications, to check to see if the safety seal is missing, and or has been broken, prior to leaving the pill

5

window, and or the nurse's sight.... This is also another "Major
[]FAILURE by the medical staff here at ACC.... Also, the self-meds
contract doesn't state to return the medication if the safety seals is broken. It
shouldn't have been broken in the 1st place!

The Health Services Director affirmed Warden Woodson's response, explaining:

> There is no evidence provided to conclude that the medical staff has
> erroneously administered your prescribed HIV medications to other
> offenders.... If you have any further issues, please resubmit a sick call
> request for further evaluation of your medical needs and treatment plan. You
> are encouraged to follow the recommendations of the health care staff as
> well. There is no violation of policy/procedure regarding this issue. No
> further action is needed from this level.

After an unsuccessful informal complaint, Harvey filed another regular grievance on February 1, 2016, alleging that medical staff did not consistently give him his daily Atripla pill as recently as January 14, 2016. Harvey complained that he was misled by staff to turn in the old pill bottle a day early on Wednesday to ensure he would get a new pill bottle on Thursday. Warden Woodson deemed the grievance unfounded, explaining:

> According to Ms. Shipp, RN they have been making changes in the
> pharmacy in both staff and procedures to try to prevent this from occurring
> and they are monitoring for improvement. Please make sure you turn your
> card in at the correct time. If for some reason you do not receive your cards
> come to the pill window and speak to the nurse in the pharmacy to ensure
> you receive your meds.

Because Harvey was not "100% sure" that he would always get a daily pill, he appealed to the Health Service Director. The Health Services Director affirmed Warden Woodson's response, explaining:

> Based on the information provided and upon further investigation, I concur
> with [Warden Woodson's] response and have determined your grievance
> UNFOUNDED. It is documented in your January 2016 Medication Record
> that you were self-medicated with a 28 day supply of Atripla medication on
> 1/13/16.... If you have any further issues, please resubmit a sick call request
> for further evaluation of your medical needs and treatment plan. You are
> encouraged to follow the recommendations of the health care staff as well.
> There is no violation of policy/procedure regarding this issue. No further
> action is needed from this level.

Harvey commenced this action in late February 2016. Lab work in March 2016 showed that Harvey's HIV viral load remained undetectable.

2. Hypertension

Harvey alleges that he did not receive blood pressure prescriptions to treat his hypertension at ACC from February 20 to December 2, 2015, and from January 28 to February 1, 2016. ECF No. 2, pageid# 21-24; No. 1, pageid# 3. As a result, Harvey allegedly experienced elevated blood pressure of up to 146/92 and suffered heart pain, chest pain, and a migraine on February 1, 2016.

A facility doctor prescribed lisinopril on September 24, 2015, but Harvey alleges he did not receive lisinopril until December 2, 2015. Harvey filed an informal complaint on November 13, 2015, alleging:

> Since 2010 I have been taken (2) two types of medications to treat my high blood pressure. . . . Since Feb. 20th, 2015, the Doctor here at [ACC] has failed to give me ANY medications to treat my [high blood pressure ("HBP")]. Because of this I demanded my HBP meds at a doctor's appointment 3 weeks ago, and the doctor agreed to place me back on my meds. After which my blood pressure was checked once a week for 3 weeks and my blood pressure is still not being control[l]ed. I demand to have my blood pressure meds.

HSA Landrum responded on November 19, 2015. She noted Harvey was placed "on meds" in September, did not appear at a follow up appointment in October, and could request an appointment discuss his symptoms with medical staff. Harvey filed a regular grievance, which Warden Woodson deemed unfounded on December 29, 2015. Warden Woodson noted that the medical department said Harvey "self-meds" the lisinopril, which had reportedly been issued to him on September 24, October 22, and November 19, 2015. In his appeal to the Health Services Director, Harvey alleged that he first received lisinopril on December 2, 2015, and denied receiving it in September, October, or November 2015. On January 13, 2016, the Health

7

Services Director affirmed the Warden's response, explaining, "It is the discretion of the ACC physician to prescribe you specific medication for your blood pressure. As you have been advised, it is reported that you are receiving your recommended blood pressure medications. If you have any further issues, please resubmit a sick call request for further evaluation of your medical needs and treatment plan."

Harvey's medical record reveals that his blood pressure was repeatedly measured while at ACC. Harvey presented to the medical department on April 17, 2015, with various complaints, and his blood pressure measured 138/102. The facility doctor admitted Harvey into the infirmary and prescribed treatments for acute bronchitis. Harvey's blood pressure lowered to 137/89 that evening and lowered to 121/85 on April 18. Harvey's blood pressure measured 139/93 when he returned to general population the next day at 9:00 a.m. Harvey returned to the medical department for a follow-up appointment on April 20, and while it initially measured 140/102, a recheck of the blood pressure during the same appointment measured 126/75. Harvey returned for follow-up appointments on April 21 and measured 132/95 in the morning and 142/94 in the evening.

Harvey sought medical treatment on May 12, 2015, for a cold, and his blood pressure measured 140/100. His blood pressure measured 114/72 during a follow-up appointment eight days later on May 20, 2015.

Harvey's blood pressured measured 135/91 during a routine vitals check on June 10, 2015. During an appointment on June 21, 2015, about muscle pain, his blood pressure measured 119/73. During the appointment on August 28, 2015, about a lump and pain in his chest, his blood pressure measured 125/86.

During a follow-up appointment on September 24, 2015, Harvey's blood pressure measured 136/96, and a facility doctor ordered lisinopril and four weekly blood pressure checks. The routine medication administration record for lisinopril is blank from September 25 to December 1, 2015. The pills were dispensed on December 2, 2015, and were to last twenty-eight days. Lisinopril was next dispensed on February 2, 2016, and to last twenty-eight days. The weekly blood pressure checks measured 133/91 on October 1, 113/103 on October 15, and 123/72 on October 20.[6]

On February 1, 2016, medical staff noted that Harvey complained of high blood pressure and a headache. His blood pressure measured 134/96, a nurse recommended ibuprofen, and Dr. Moreno ordered that recommendation. Harvey received a renewed self-meds supply of lisinopril on February 2, 2016. Harvey returned to the medical department on February 5, 2016, about feelings of high blood pressure, but it is unclear from the record how the nurse treated him.

3. Syphilis

A facility doctor had referred Harvey to a hospital for an ultrasound exam to investigate Harvey's specific complaints of a lump and pain in his left chest. Harvey faults Dr. Moreno and HSA Landrum for not ordering a more thorough ultrasound exam, since he was already going to get an ultrasound at a hospital, to discover whether syphilis had damaged any of his organs.

Harvey filed an informal complaint on May 3, 2015, discussing how he had wanted medical staff to contact a former treating doctor outside the prison to discuss the syphilis diagnosis. HSA Landrum responded on May 7, 2015, noting that the medical release form had been signed that same day and that she would seek the information from the outside doctor as Harvey had requested.

---

[6] The medical record states Harvey did not appear for a blood pressure check on October 30, 2015.

A nurse practitioner with MCV issued a final report on July 21, 2015, noting Harvey's history of syphilis:

> Received a call from Chelsea at [ACC] requesting info regarding most recent syphilis treatment. Pt was last seen by me in June 2015 via telemedicine. As indicated in my note, he was diagnosed with late latent syphilis after labs revealed a + titer of 1:16 on 3/17/15. He was consequently treated with Bicillin x3 in March 2015. His previous RPRs dating back to 2009 from his previous provider were neg. Pt likely contracted syphilis >12 months ago. Most recet RPR from May 2015 shows a titer 1:16 – it will be repeated every 3 months for about a year.

In response to another informal complaint dated November 19, 2015, HSA Landrum told Harvey on November 24, 2015, to submit a sick call request if he wanted to consult with a doctor about his syphilis. Harvey acknowledged in his subsequent grievance, "I'm not sick, I just want to go to the hospital for my ultrasound to check all of my internal organs for damage."

Warden Woodson deemed the related regular grievance unfounded, noting that Harvey had received an ultrasound per the doctor's order and that Harvey could follow up via sick call if he wanted to discuss additional medical concerns with a doctor. The Health Services Director affirmed Warden Woodson's response, noting, "It is the discretion of the ACC physician to recommend you specific diagnostic testing. . . . If you have any further issues, please resubmit a sick call request for further evaluation of your medical needs and treatment plan."

### B. Defendants' Limited Personal Involvement

HSA Landrum, Dr. Moreno, and Warden Woodson and Health Services Director Herrick filed three motions for summary judgment supported by affidavits, noting the following facts.

1. HSA Landrum

HSA Landrum provided administrative services at ACC between November 17, 2014, and January 4, 2016. As the HSA, she oversaw the medical department from an administrative perspective, such as handling payroll, responding to grievances, and facilitating the receipt of

10
Case 7:16-cv-00097-EKD-RSB   Document 42   Filed 03/17/17   Page 10 of 20   Pageid#: 570

medical records and other paperwork from private medical providers. HSA Landrum avers that she could not and would not order or administer any medicine and that she did not provide any medical service to Harvey.

Harvey arrived at ACC on February 18, 2015, without Atripla pills and without an existing prescription for Atripla. Pursuant to the custom at the time for HIV-positive inmates needing prescriptions upon arrival, the ACC pharmacy nurse contacted MCV Hospital on February 18, 2015, for an Atripla prescription. Once MCV approved the prescription, it arrived on February 21, 2015, and was given to Harvey on that same day. HSA Landrum avers that the medical record reflects that Harvey did not receive Atripla for three days between February 18 and 20 and received the first dose on February 21, 2015.[7]

HSA Landrum reports that nothing in Harvey's medical record reveals a doctor's order for chlorthalidone. She notes that an ACC facility doctor prescribed lisinopril for the first time on September 24, 2015, and that it was to be "kept on person," meaning Harvey was to receive, dose, store, and request refills himself.

2. Dr. Moreno

Between November 1, 2015, and March 25, 2016, Dr. Moreno served as the ACC medical director and was one of two facility doctors who provided medical services to inmates. Dr. Moreno avers that he does not administer medications and that nurses do.

Dr. Moreno explains that he never personally treated or saw Harvey and never received any complaint from Harvey about lacking HIV medications. Dr. Moreno notes that his name appears in Harvey's medical file in two places. First, Dr. Moreno received and reviewed the ultrasound report on November 10, 2015, and second, ordered ibuprofen on February 1, 2016, to

---

[7] As noted earlier, Harvey alleges he did not receive Atripla between February 18 and 23, 2015, and between February 20 and 23, 2015. *Compare, e.g.,* ECF No. 2, pageid# 26-27, *with* No. 25-1, pageid# 270.

treat Harvey's complaints to a nurse about high blood pressure and a headache. Dr. Moreno also notes that the other facility doctor ordered lisinopril and the ultrasound.

 3. Warden Woodson and Health Services Director Herrick

As the Warden, Woodson is responsible for the day-to-day operations of the prison but has no responsibility or supervision over the actual administration of medical services by health care providers. He denies ever being apathetic toward Harvey's medical needs or prohibiting Harvey from seeking medical services, and he avers that he relies on the judgment of medical professionals. He responds to Level I grievances.

Steve Herrick has served as Health Services Director since March 25, 2016. He manages the overall operation of VDOC's Health Services, and, in this capacity, he responds to Level II grievances concerning medical treatment. He explains that, when his office receives an inmate's grievance appeal, the inmate's medical record is reviewed with facility medical staff to ensure that the complaints are addressed.

## II. DISCUSSION

### A. Summary Judgment Standard

The parties filed motions for summary judgment. Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In order to preclude summary judgment, the dispute about a material fact must be "'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). Section 1983 permits an aggrieved party to file a civil action against a person for actions taken under color of

state law that violated his constitutional rights. *See Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013). If the evidence of a genuine issue of fact material to the plaintiff's § 1983 claim "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250.

In considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *See, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment, however. *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993) ("The summary judgment inquiry thus scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial."); *see Cloaninger*, 555 F.3d at 336 (noting that a plaintiff may not amend a complaint through argument in a brief about summary judgment).

### B. Eighth Amendment

Liberally construed, Harvey asserts that defendants violated the Eighth Amendment when their staff delayed treatments for HIV and hypertension and did not order an ultrasound to check all his organs. To establish a violation of this right requires proof that: (1) objectively, the prisoner plaintiff was suffering from a serious medical need, and (2) subjectively, a defendant acted with deliberate indifference. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

> Deliberate indifference entails something more than mere negligence [but] is satisfied by something less than acts or omissions for the very purpose of

13

> causing harm or with knowledge that harm will result. Basically, a prison official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. A prison official is not liable if he knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent.

*Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998) (internal quotation marks and citations omitted). "[A]n inadvertent failure to provide adequate medical care" or negligence "in diagnosing or treating a medical condition" does not amount to deliberate indifference. *Estelle*, 429 U.S. at 105, 106. Similarly, the "deliberate indifference standard is not satisfied by . . . mere disagreement concerning [q]uestions of medical judgment." *Germain v. Shearin*, 531 F. App'x 392, 395 (4th Cir. 2013) (internal quotation marks and citations omitted). "[O]nly the unnecessary and wanton infliction of pain implicates the Eighth Amendment[.]" *Wilson v. Seiter*, 501 U.S. 294, 278 (1991) (internal quotation marks omitted).

To succeed with an unconstitutional medical treatment claim against defendants who were not the treating medical staff, a plaintiff must show that the official was personally involved with a denial of treatment, deliberately interfered with a prison doctor's treatment, or tacitly authorized or was deliberately indifferent to the medical provider's misconduct when even a lay person would understand that the medical provider is being deliberately indifferent. *Miltier v. Beorn*, 896 F.2d 848, 854 (4th Cir. 1990).

To establish a supervisor's liability under § 1983, a plaintiff must show that: (1) the supervisor had actual or constructive knowledge that a subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to people like the plaintiff; (2) the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional

14

injury suffered by the plaintiff. *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994). Supervisory prison officials are entitled to rely on the professional judgment of trained medical personnel, and supervisory liability is not established merely by showing that a subordinate was deliberately indifferent to a plaintiff's medical need. *Miltier,* 896 F.2d at 854.

For *Shaw*'s first element, a plaintiff must establish: (1) the supervisor's knowledge of (2) conduct engaged in by a subordinate (3) where the conduct poses a pervasive and unreasonable risk of constitutional injury to the plaintiff. *Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984). Establishing a "pervasive" and "unreasonable" risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions, and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury. *Id.* at 373-74.

For *Shaw*'s second element, a plaintiff may establish deliberate indifference by demonstrating a supervisor's "continued inaction in the face of documented widespread abuses." *Id.* at 373. A plaintiff "[o]rdinarily . . . cannot satisfy his burden of proof by pointing to a single incident or isolated incidents . . . for a supervisor cannot be expected . . . . to guard against the deliberate . . . acts of his properly trained employees when he has no basis upon which to anticipate the misconduct." *Id.* (internal citation omitted).

For *Shaw*'s third element, "[t]he proof of causation may be direct . . . where the policy commands the injury of which the plaintiff complains . . . [or] may be supplied by [the] tort principle that holds a person liable for the natural consequences of his actions." *Shaw*, 13 F.3d at 799. A supervisor's failure to act in the face of a known risk does not alone establish liability. *Slakan*, 737 F.2d at 376-77.

1. HIV

Defendants are entitled to summary judgment for the HIV claim. Harvey believes the defendants are responsible for the supervision of medical staff at ACC, and thus, the defendants violated the Eighth Amendment when medical staff did not give him, *arguendo*, twelve daily doses of Atripla over nearly eleven months through the self-meds program. However, he cannot rely on *respondeat superior* against the defendants, and his speculation of defendants' supervision or involvement with dispensing Atripla is insufficient to plead a constitutional violation. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 663 n.7, 691-94 (1978).

Also, of the alleged twelve missed daily doses, it was not possible to dispense the initial daily doses of Atripla in February because Harvey did not arrive at ACC with the pills or a prescription. HSA Landrum avers the medical record shows Harvey received the first dose on February 21, 2015, after the prescription was approved, but Harvey asserts he received his first dose of Atripla on February 24, 2015. Other than the missed doses in February 2015, the other allegedly missed daily doses were three consecutive days in March 2015 and one missed day per month in November 2015, December 2015, and January 2016. When viewed in that more accurate synopsis, the court does not find that Harvey missing, *arguendo*, twelve daily doses of prescribed medicine through the self-meds program over approximately 330 days constitutes a pervasive and widespread problem.[8] *See, e.g.*, *Slakan*, 737 F.2d at 373-74. Moreover, Harvey fails to establish any "affirmative, causal link" between these missed doses through the self-meds program and any personal act or omission by a defendant.

---

[8] Consequently, the dispute of whether Harvey received Atripla between February 21 and 23 is not material to the disposition of this claim against these supervisory defendants.

Additionally, Harvey fails to establish any resultant harm or serious risk of harm for these sporadic delays in receiving Atripla. *See, e.g.*, *Webb v. Hamidullah*, 281 F. App'x 159, 166 (4th Cir. 2008) ("An Eighth Amendment violation only occurs, however, if the delay results in some substantial harm to the patient."); *Olson v. Stotts*, 9 F.3d 1475, 1477 (10th Cir. 1993) (noting the same). Harvey's medical records from MCV before his incarceration noted that Harvey's highly active antiretroviral therapy was interrupted between January and April 2011. Yet, he returned to undetectable viral loads, remained in stage 1, and had high CD4 counts upon resuming Atripla in 2011, despite those four months of interrupted treatment.

In contrast, Harvey missed, *arguendo*, eight daily doses between February 18 and April 16, 2015. Harvey's viral load did consequently increase from undetectable to 155 copies between February 18 and April 16, 2015, but notably, the viral load was again undetectable and he still had a "high" CD4 count four weeks later by May 11, 2015, after resuming Atripla on March 30, 2015. The medical record repeatedly notes that Harvey's HIV infection remained in stage 1, the least unhealthy of HIV stages, throughout the relevant periods of this litigation. Harvey fails to establish that any of the, *arguendo*, twelve missed doses resulted in substantial harm.

While the sporadic breaks in Harvey prescription to treat HIV is certainly disconcerting, Harvey fails to establish that these supervisory defendants inflicted cruel and unusual punishment in violation of the Eighth Amendment. Claims of medical staff's negligence are not actionable via § 1983 and are not imputable to defendants via *respondeat superior*. *See, e.g.*, *Monell*, 436 U.S. at 663 n.7, 691-94; *Estelle*, 429 U.S. at 105-06. Also, none of the defendants' responses to grievances evinces deliberate indifference. Accordingly, defendants are entitled to summary judgment for the HIV claim.

2. Hypertension

Defendants are entitled to summary judgment for the hypertension claim. The record establishes that a facility doctor had prescribed lisinopril on September 30, 2015, and that staff repeatedly measured and recorded his blood pressure during numerous medical appointments. Harvey's desire to have prescriptions for both chlorthalidone and lisinopril is a disagreement of diagnosis and course of treatment not actionable via § 1983 or imputable to these defendants via *respondeat superior*. *See, e.g., Monell*, 436 U.S. at 663 n.7, 691–94; *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985).

Harvey fails to establish these supervisory defendants' deliberate indifference. There is nothing to indicate that the Jail's medical records, which noted hypertension and prescriptions for chlorthalidone and lisinopril, were part of the medical records available to defendants. Assuming that defendants had access to and did review Harvey's medical file at ACC, the recorded blood pressure measurements ranged from 114/72, which qualifies as normal blood pressure, to 146/92, which may barely qualify as a low range of stage 1 hypertension.[9] *See Miltier*, 896 at 854 (noting that a lay person would have to understand that the medical provider is being deliberately indifferent). On November 19, 2015, HSA Landrum responded to Harvey's informal complaint about blood pressure medicine. Notably, he did not allege in the informal complaint that medical staff had not dispensed the medication after the doctor ordered it in September, and nothing about HSA Landrum's response evinces her deliberate indifference.

Even if he could show a defendant's deliberate indifference for the delay in receiving lisinopril between February 18 and December 2, 2015, he does not describe a substantial harm

---

[9] *See* HIGH BLOOD PRESSURE (HYPERTENSION) TESTS AND DIAGNOSIS, http://www.mayoclinic.org/diseases-conditions/high-blood-pressure/basics/tests-diagnosis/con-20019580 (last visited on March 14, 2017) ("Your blood pressure is normal if it's below 120/80 mm Hg . . . . Prehypertension is a systolic pressure ranging from 120 to 139 mm Hg or a diastolic pressure ranging from 80 to 89 mm Hg . . . . Stage 1 hypertension is a systolic pressure ranging from 140 to 159 mm Hg or a diastolic pressure ranging from 90 to 99 mm Hg."). The court notes that Harvey had just become 29 years old before arriving at ACC.

18

resulting during that time, and his blood pressure measurements during that time were mostly unremarkable. *See, e.g.*, *Webb*, 281 F. App'x at 166 ("An Eighth Amendment violation only occurs, however, if the delay results in some substantial harm to the patient.").

Harvey complains that he experienced some harm on February 1, 2016, due to heart pain, chest pain, and a migraine allegedly in response to high blood pressure, but he received treatment from a nurse during the same day. While Harvey is dissatisfied with the nurse's treatment, Harvey does not demonstrate how these supervisory defendants are liable for that nurse's treatment during that one appointment. *See, e.g.*, *Slakan*, 737 F.2d at 373. Harvey does not establish that any defendant was notified or recognized that his lisinopril had not been dispensed in January 2016, which culminated in experiencing the pains on February 1, 2016.

Consequently, Harvey fails to establish that he suffered any harm except for the alleged symptoms on February 1, 2016. Harvey further fails to establish how these supervisory defendants were deliberately indifferent to the delay or interruption in receiving a prescription for hypertension, and their responses to grievances "fall[] far short of establishing § 1983 liability." *DePaola v. Ray*, No. 7:12cv00139, 2013 U.S. Dist. LEXIS 117182, at *23, 2013 WL 4451236, at *8 (W.D. Va. July 22, 2013) (Sargent, M.J.) (citing *Brooks v. Beard*, 167 F. App'x 923, 925 (3rd Cir. 2006)). Accordingly, defendants are entitled to summary judgment for the hypertension claim.

3. Syphillis

Defendants are entitled to summary judgment for the syphilis claim. Harvey fails to establish any substantial risk of injury by not having his organs checked by ultrasound while already at the hospital in October 2015. Harvey acknowledged in a grievance that the syphilis did not make him sick but that he "just want[ed] to go to the hospital . . . to check all . . . internal

19

organs for damage." Harvey's fear of organ damage is based on his own speculation, and the record clearly evinces that he had access to medical staff to discuss his concerns about his organs. While he disagrees with the scope of a facility doctor's order for an ultrasound to check his chest only and not all his organs, this disagreement is not actionable via § 1983 or imputable to defendants via *respondeat superior*.

Moreover, Harvey does not demonstrate how a defendant knew a subordinate was, *arguendo*, engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury, especially since his medical record showed the facility doctor had ordered an ultrasound to diagnose his complaints of chest pain. Also, none of the defendants' grievance responses evinces deliberate indifference. *See, e.g.*, *id.* Accordingly, defendants are entitled to summary judgment for the syphilis claim.

### III. CONCLUSION

For the reasons set forth in this opinion, the court will grant defendants' motions for summary judgment and deny Harvey's motions for summary judgment.

Entered: March 17, 2017.

/s/ *Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge